# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF COLORADO
### The Honorable Michael E. Romero

| | |
|---|---|
| In re: | ) |
| | ) Case No. 09-18982 MER |
| THOMAS LEROY SMITH | ) |
| | ) Chapter 7 |
| Debtor. | ) |
| | ) |
| | ) |
| GLEN R. ANSTINE, Chapter 7 Trustee | ) Adversary No. 10-1396 MER |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| PEAK REHABILITATION OF DENVER, | ) |
| LLC; MICHAEL BIBA and MICHAEL | ) |
| DETTER | ) Signed/Docketed |
| | ) June 22, 2011 |
| Defendants. | ) |

## AMENDED ORDER[1]

THIS MATTER comes before the Court on the *Complaint for Turnover of Estate Property* (the "Complaint") filed by Glen R. Anstine, Chapter 7 Trustee, and the *Defendants' Answer to Complaint for Turnover of Estate Property* (the "Answer") filed by Peak Rehabilitation of Denver, LLC, Michael Biba, and Michael T. Detter.

## JURISDICTION

The Court has jurisdiction over this matter under 28 U.S.C. §§ 1334(a) and (b) and 157(a) and (b). This is a core proceeding under 28 U.S.C. § 157(b)(2) as it concerns a request for turnover of property of the estate pursuant to 11 U.S.C. § 542(b).[2]

---

[1] This Amended Order amends the Order issued by the Court on May 20, 2011, to include the correct amount of damages: $98,000.00, plus costs, interest and attorneys' fees under the Note. See page 11 of 11.

[2] Unless otherwise noted, all future statutory references in the text are to Title 11 of the United States Code.

## BACKGROUND FACTS

Based on the pleadings, Pretrial Statement,[3] and evidence presented at trial, the Court finds the following facts to be undisputed:

- Thomas Leroy Smith (the "Debtor") filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code on May 13, 2009 (the "Petition Date").[4]

- Glen Anstine (the "Trustee") is the duly appointed Chapter 7 Trustee in the Debtor's bankruptcy case.[5]

- Peak Rehabilitation of Denver, LLC ("Peak") is a Colorado limited liability company formed on March 6, 1997, whose principal street address is 16534 Keystone Blvd., Ste. C, Parker, CO 80134.[6]

- Prior to February 2009, Peak was owned by the Debtor (37%, 3,700 membership units),[7] Michael Biba (33%, 3,300 membership units),[8] and Michael Detter (30%, 3,000 membership units).[9]

- Starting in or around the Spring of 2008, the business and personal relationships soured between the Debtor on the one side and Michael Biba ("Biba") and Michael Detter ("Detter") on the other.[10]

- On or about November 20, 2008, a flyer titled, "Neighborhood Emergency Newsletter" was distributed in Peak's parking lot.[11] The same flyer was distributed in Detter's

---

[3] Pretrial Statement filed March 1, 2011 (10-01396-MER, Docket #26).

[4] Complaint ¶ 4, Answer ¶ 4. Pretrial Statement, Stipulated Fact 1.

[5] Complaint ¶ 5, Answer ¶ 5. Pretrial Statement, Stipulated Fact 2.

[6] Complaint ¶ 6, Answer ¶ 6. Pretrial Statement, Stipulated Fact 3.

[7] Pretrial Statement, Stipulated Fact 4. Although Peak was formed in 1997, the Debtor testified he did not purchase his 37% membership interest until the end of 2004 or the beginning of 2005.

[8] Biba is also the registered agent for Peak. Complaint ¶ 6-7, Answer ¶ 6-7. Pretrial Statement, Stipulated Fact 5.

[9] Pretrial Statement, Stipulated Fact 6.

[10] Peak, Detter and Biba will collectively be referred to as "the Defendants."

[11] Exhibit E.

- neighborhood on or about November 22, 2008.[12] The flyer contained derogatory statements regarding Peak, Detter, and Biba.[13]

- On or about November 20, 2008, a post was made on the website www.ripoffreport.com containing derogatory statements regarding Peak, Detter and Biba.[14]

- On February 25, 2009, the Debtor entered into and executed 1) an "Agreement for Redemption of Membership Interest" (the "Agreement")[15] and 2) an "Assignment of Membership Interest" (the "Assignment"),[16] under which he sold, assigned, transferred and set over to Peak his 37% membership interest in Peak for consideration of $142,000.00.

- The Agreement included a non-disparagement clause, whereby the Debtor was restrained from making any derogatory statements concerning Peak and his former business partners. Furthermore, it required the Debtor remove all derogatory comments from "ripoff.com."[17]

- Under the Agreement, Peak was to pay the Debtor $20,000 at the time of closing of the Agreement, with the balance of $122,000 payable as follows:

  April 1, 2009 to June 3, 2009 - $2,000.00 per month
  July 1, 2009 to January 1, 2010 - $6,000.00 per month
  February 1, 2010 to August 1, 2010 - $10,000.00 per month
  September 1, 2010 until paid in full - $4,000.00 per month[18]

- $20,000 was paid to the Debtor at or around the time of the closing of the Agreement.[19]

- On or about February 25, 2009, Peak (as "Maker") and Biba and Detter (each as "Guarantors"), executed a Promissory Note (the "Note") payable to the Debtor in the principal amount of $122,000.00, bearing no interest, payable as follows:

---

[12] Exhibit E.

[13] Exhibit E.

[14] Pretrial Statement, Stipulated Fact 7.

[15] Pretrial Statement, Stipulated Fact 8. Exhibit A/3 (Agreement, ¶ 1).

[16] Pretrial Statement, Stipulated Fact 10. Exhibit C/2 (Assignment).

[17] Pretrial Statement, Stipulated Fact 9. Exhibit A/3 (Agreement, ¶ 13).

[18] Pretrial Statement, Stipulated Fact 11. Exhibit A/3 (Agreement, ¶ 1).

[19] Pretrial Statement, Stipulated Fact 12.

       April 1, 2009 to June 3, 2009 - $2,000.00 per month
       July 1, 2009 to January 1, 2010 - $6,000.00 per month
       February 1, 2010 to August 1, 2010 - $10,000.00 per month
       September 1, 2010 until paid in full - $4,000.00 per month.[20]

- Biba and Detter personally guaranteed the Note, jointly and severally.[21]

- Prior to the Petition Date, Peak and/or Biba and Detter made the following payments to the Debtor:

   | Date | Amount |
   |---|---|
   | March 20, 2009 | $2,000.00 |
   | April 25, 2009 | $2,000.00.[22] |

- After the Petition Date, Peak and/or Biba and Detter made the following payments to the Trustee:

   | Date | Amount |
   |---|---|
   | June 2, 2009 | $2,000.00 |
   | July 2, 2009 | $6,000.00 |
   | July 30, 2009 | $6,000.00 |
   | October 1, 2009 | $6,000.00.[23] |

- The Note provides:

   If any payment required by this Note is not made at the time the same shall become due and payable, or if a default or event of default occurs under any document executed as security for or in connection with this Note, the holder of this Note may declare a default hereunder. Prior to a default, the holder shall send to Maker a written notice. Maker shall have ten (10) days to cure such default. Upon the declaration of a default hereunder, the principal balance and accrued interest as of the date of acceleration shall bear interest at the prime rate as of the default date (as published by the *Wall Street Journal*), plus two percent (2%), compounded annually, until any default is cured.[24]

---

[20] Pretrial Statement, Stipulated Fact 13. Exhibit B/4 (Note).

[21] Pretrial Statement, Stipulated Fact 14. Exhibit B/4 (Note, p.2).

[22] Pretrial Statement, Stipulated Fact 15.

[23] Pretrial Statement, Stipulated Fact 15.

[24] Pretrial Statement, Stipulated Fact 17 and 19. Exhibit B/4 (Note, p.1). Trustee's counsel requested the Court take judicial notice the prime rate as of the default date was 3.5%.

- The Note further provides: "Maker will pay all costs and expenses, including reasonable attorneys' fees, paid or incurred by the holder of this Note in enforcing this Note on default, regardless of whether an action shall be instituted to collect this Note, and in collecting any judgment entered hereon."[25]

- On March 10, 2010, the Trustee sent written notice of default to Larry D. Harvey, Esq., 5290 DTC Parkway, Suite 150, Englewood, CO 80111, counsel for Defendants, informing him that failure to cure the default would render the full $92,000.00 balance due and payable.[26]

## DISCUSSION

Section 542 governs turnover of property to the estate and provides, in relevant part, as follows:

> (a) Except as provided in subsection (c) or (d) of this section, an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.
>
> (b) Except as provided in subsection (c) or (d) of this section, an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee, except to the extent that such debt may be offset under section 553 of this title against a claim against the debtor.[27]

The Trustee alleges the Note is in default and constitutes property of the bankruptcy estate pursuant to § 541. He contends the full remaining balance is due and owing and seeks an Order pursuant to § 542 requiring the Defendants forthwith to turn over and deliver to the Trustee the sum of $92,000.00, plus interest at five and one-quarter percent (5.25%) per annum from March 10, 2010 (the date of the Trustee's written notice of default) until paid in full.[28] The

---

[25] Pretrial Statement, Stipulated Fact 20. Exhibit B/4 (Note, p.1).

[26] Pretrial Statement, Stipulated Fact 18.

[27] 11 U.S.C. § 542.

[28] The Trustee's request for interest is based on the terms of the Note and the prime rate as published by the Wall Street Journal on March 10, 2010 of 3.25%, plus 2%. Exhibit B (Note, p. 1) and Exhibit 14 (printout from www.wsjprimerate.us showing the prime rate history).

Trustee further seeks the award of his reasonable costs and attorneys' fees in enforcing the Note and in collecting any judgment pursuant to the provisions of that document.[29]

In their Answer, the Defendants assert the following affirmative defenses: 1) the Trustee has failed to state a claim upon which relief may be granted, 2) the Trustee's claims may be barred in whole or in part by applicable statutes of limitations, 3) the Trustee's claims may be barred in whole or in part by the doctrines of Accord and Satisfaction, Acquiescence, Contributory Negligence, Release, Laches, Waiver, Estoppel and/or Unclean Hands, 4) any failure to mitigate reduces or bars the Trustee's recovery, and 5) the Trustee's claims are substantially frivolous, vexatious and/or groundless, justifying an attorney fee award in favor of Defendants.[30]

The Defendants assert they are excused from making any further payments under the Note because the Debtor has materially breached the Agreement by failing to comply with the non-disparagement clause in the Agreement. The relevant paragraph of the Agreement provides:

> **Non-Disparagement.** Neither Smith nor Peak, nor their successors and assigns, may directly or indirectly disparage the reputation of the other party hereto to such other party's customers, employees, vendors, or Peak's potential partners or investors, or other third parties. Specifically, Smith shall remove all derogative comments from "ripoff.com" *made by Smith or his spouse*, personally, and any communications or comments by the spouse of Smith shall be strictly attributed to Smith. In the event of a breach of the provisions of this paragraph, the aggrieved party shall have a right to injunctive relief or actual damages, as well as liquidated damages of $1,000.00 per incident, in addition to legal and investigative expenses incurred in the enforcement of the provisions herein. The foregoing provisions do no [sic] apply to any statements made in connection with the prosecution or defense of any litigation or truthful statements made in response to any governmental inquiries or legal process, provided the party making such statements provides the other party written notice of the deposition, interrogatory or subpoena at least five (5) business days before such statements are made.[31]

Specifically, the Defendants assert the Debtor breached the Agreement by failing to remove all derogatory comments from www.ripoffreport.com made by the Debtor's spouse.[32] The Defendants offered a printout from the website showing a comment posted on November 20, 2008, by an author identified only as "L" from Arvada, Colorado. The Defendants believe the

---

[29] The Trustee request for interest is based on the terms of the Note. Exhibit B/4 (Note, p. 1).

[30] Answer p. 3.

[31] Exhibit A/3 (Agreement, ¶ 13) (emphasis added).

[32] Pretrial Statement, pp. 1-2.

author of the post is the Debtor's wife, Loretta Marie Zaballos, because her name begins with an "L" and she resides in Arvada, Colorado.[33] Further, the author of the post refers to "the money my family loaned" Peak and states "[Biba] convinced my husband to loan him $250,000 as an Investment" in Peak.[34] The Defendants contend such statements only make sense coming from the Debtor's wife.

According to the Trustee, however, the obligation to remove such a derogatory post was never triggered because neither the Debtor nor his spouse personally made the comment. Rather, the Debtor and his wife both testified they believe a former Peak employee, and friend of the Debtor's wife, Rachel Tapia, posted the comment.[35] [36] The Trustee further asserts even if the Court finds the Debtor or his spouse made the post, the Debtor nonetheless substantially performed under the non-disparagement clause by posting the following comment on April 28, 2009, in response to the November 20, 2008 comment:

> The report submitted on November 20, 2008 about Mike and Mike was sent by someone outside of my family and they/it provided information that is not true (although the words "convinced my husband" implies this was sent by my wife. She did not submit the report.).[37]

---

[33] Exhibit D (website printout from www.ripoffreport.com, p.1).

[34] Exhibit D (website printout from www.ripoffreport.com, p.1). Defendants' belief is further supported by Loretta Zaballos' admission that she did help co-author a flyer (Exhibit E) that was disbursed on November 20 and 22, 2008 which contained the same and similar language as that posted on www.ripoffreport.com.

[35] The Debtor's testimony regarding his belief is supported by an email sent by the Debtor to Biba on February 25, 2009, at 8:34 a.m. (the morning of the date the parties executed the Agreement, Assignment and Note). Exhibit M. That email states:

> I have identified the person responsible for the information put on Ripoff.com. I am able to remove the comments as only the author can respond in kind. I am currently taking steps to have that former employee remove or respond that Peak has successfully satisfied the issue(s). This should occur today. If not, I will let you know the timetable to complete this action.
>
> This email will serve that I am complying with your request to remove/satisfy favorably, the comments made on Rip Off Report .com.

Exhibit M. The Debtor testified the email contained an obvious typographical error and should have stated, "I am [**unable** or **not able**] to remove the comments as only the author can respond in kind."

[36] Although he maintains neither he, nor his wife, made the post, Smith testified he agreed to have the derogatory remarks removed from www.ripoffreport.com because he wanted to "move on."

[37] Exhibit D (website printout from www.ripoffreport.com, p. 2, comment #2 submitted on April 28, 2009 by "3rd owner").

The Debtor's comment goes on to provide a positive review of Peak's clinics and physical therapists.[38] Further, although the Debtor admitted he did not make any attempts to contact the website to have the November 2009 post removed, the Trustee argues the obligation to remove such a derogatory post was impossible because the website does not remove reports from its database.[39] The Trustee further argues the Defendants waived any breach of the non-disparagement clause by failing to notify the Debtor or Trustee of such a breach and by continuing to make payments on the Note through October 2009. The Trustee also contends the Defendants' obligation to pay the Note is independent of the parties' obligations under the Agreement. Finally, if the Court finds the Debtor breached the non-disparagement clause, the Trustee maintains the Defendants' remedies are limited to those specified in paragraph 13 of the Agreement (the non-disparagement clause), which the Defendants have not sought.

### A. The Debtor Did Not Breach the Agreement.

The primary fact at issue in determining if a breach of the Agreement occurred is whether the derogatory comments posted on www.ripoffreport.com were "made by Smith or his spouse." Smith's testimony was guarded, but there was no direct indication he was anything less than truthful. The Court finds the evidence is clear that Smith did not make the post. At best, the Defendants may have shown a 50% probability Loretta Marie Zaballos wrote the post. Ms. Zaballos' denial is suspect, but her explanation a friend made the post is plausible. Further, the Debtor made the Defendants aware on February 25, 2009 (the date the Agreement, Assignment and Note were executed) that he [the Debtor] believed the post was made by a former employee, and not his spouse.[40] Therefore, the Court finds the Defendants failed to meet their burden of proving Ms. Zaballos made the post. Consequently, the Defendants failed to meet their burden of proving the Debtor breached the Agreement.

---

[38] Exhibit D (website printout from www.ripoffreport.com, p. 2, comment #2 submitted on April 28, 2009 by "3rd owner").

[39] Exhibit 15 (website printout from www.ripoffreport.com, stating, in part, "We DO NOT remove reports from our database."

[40] Exhibit M.

### B. Even If the Debtor Breached the Agreement, the Defendants Are Not Relieved from Their Obligations under the Note.

The Defendants argue the nondisparagement clause was a material aspect of the Agreement and that the Debtor's breach of such clause relieves them of their duty to perform.[41] Clearly, the primary purpose of the Agreement, Assignment and Note was to buy out the Debtor's ownership interest in Peak and sever all business and personal relationships between the Defendants and the Debtor. There was no evidence the Debtor failed to relinquish his 37% ownership interest. The nondisparagement clause may have been important to the Defendants, but, as noted above, the Debtor told the Defendants on February 25, 2009, he believed the post was made by a former employee, not his spouse.[42] Moreover, the derogatory comments were posted on www.ripoffreport.com on November 20, 2008. The Agreement was entered into on February 25, 2009. Biba sent an email to Smith sometime in April 2009 reminding Smith to remove the post, and the Debtor's retraction or response was posted on April 28, 2009. The Debtor filed his bankruptcy petition on May 13, 2009. The Defendants did not declare a default, but rather continued to make timely payments under the Note from March 20, 2009 through October 1, 2009. Based on the timeline of events and the Defendants' actions, even if the Debtor

---

[41] Defendants cite to *Converse v. Zinke*, wherein the Colorado Supreme Court stated:

> Proof of a material failure of consideration may excuse a party from performing its duties under a contract. If one party has failed to perform the bargained for exchange, the other party may be relieved of a duty to continue its own performance, where the failure is material and unexcused. However, an incomplete performance may not amount to a material failure which would fully excuse a duty to return performance, when the performance given may be considered an equivalent to the performance owed. See Restatement (Second) of Contracts, §§ 237 and 240 (1981). The extent to which an injured party will obtain substantial benefit from the contract, as well as the adequacy of compensation in damages, should be considered in determining the materiality of failure of performance. Restatement (Second) of Contracts, § 241 (1981).
> . . .
> Generally, a partial failure of consideration imports a breach of contract, but not a breach sufficient to relieve the injured party of the duty of performance. Thus, a partial failure of the consideration may be a defense pro tanto where the contract and the consideration are apportionable and the amount of the failure may be fairly ascertained by computation. See generally 17 Am.Jur.2d Contracts, s 398, and Restatement (Second) of Contracts, s 240 (1981).
>
> "(T)he defendant is not justified in refusing to perform his promise if the plaintiff's failure is only partial and is such that full and just compensation can be made by the payment of money damages." A. Corbin, Corbin on Contracts, s 659 (1963).
>
> Colorado cases recognize that partial failure of consideration is not a defense to a promissory note, unless the failure is apportionable, in which case the remedy lies in "a set-off, or by an original action for damages." Brevoort v. Hughes, 10 Colo.App. 379, 50 P. 1050 (1897). See also Gillett v. Cheairs, 79 Colo. 20, 243 P. 1112 (1926).

*Converse v. Zinke*, 635 P.2d 882,887 (Colo. 1981).

[42] Exhibit M.

breached the Agreement, the Court finds the breach was not such that the Defendants were relieved of their obligation to perform under the Note.

Further, even if the Court found Ms. Zabbalos wrote the post on www.ripoffreport.com, the Defendants' remedy is limited to that specifically provided in the Agreement at paragraph 13:

> In the event of a breach of the provisions of this paragraph, the aggrieved party shall have a right to injunctive relief or actual damages, as well as liquidated damages of $1,000.00 per incident, in addition to legal and investigative expenses incurred in the enforcement of the provisions herein.[43]

Although the Defendants argue this is not their exclusive remedy, this sentence uses the word "shall"[44] and is different from the remedies provided in other paragraphs.[45] The Defendants have not requested any damages other than an award of Defendants' attorneys fees and costs pursuant to the Note and "such other and further relief as the Court deems just and proper."[46] Thus, the Court finds the Defendants were not relieved from their obligations under the Note.[47]

---

[43] Exhibit A/3 (Agreement, ¶ 13).

[44] While paragraph 13 does not state these are the "exclusive remedies" it does use the word "shall" rather than "may" indicating the remedies listed are the exclusive remedies. In contrast, in *Wu v. Good* the Colorado Court of Appeals found "that the word 'may' in the contract implies a permissive remedy and does not bar sellers from seeking other remedies available to them." *Wu v. Good*, 720 P.2d 1005, 1008 (Colo. App. 1986).

[45] For instance, paragraph 11 of the Agreement sets forth certain non-competition and non-solicitation covenants and provides that, upon breach of any of these covenants, Defendants "shall have the right to seek monetary damages for any past breach and equitable relief, including specific performance by means of an injunction, to prevent any further breach." Exhibit A/3 (Agreement, ¶ 11). The Court has also considered the fact that Peak's attorney, Larry D. Harvey, Esq., assisted in drafting the Agreement and therefore any ambiguities in the Agreement must be construed against the drafter, Peak. *See K & V Scientific Co., Inc. v. Bayerische Motoren Werke Aktiengesellschaft* ("*BMW*"), 314 F.3d 494, 500 (10th Cir. 2002).

[46] Answer, p.3.

[47] In making this determination, the Court has rejected the Trustee's "impossibility" argument. In *Dominion Video Satellite, Inc. v. Echostar Satellite L.L.C.*, the Tenth Circuit Court of Appeals stated:

> Under the defense of impossibility of performance, a party's breach of its contractual obligation will be excused when "changed circumstances have rendered the promise vitally different from what reasonably should have been within the contemplation of both parties when they entered into the contract." *Colo. Performance Corp. v. Mariposa Assocs.*, 754 P.2d 401, 407 (Colo. App. 1987) (quotation omitted).

*Dominion Video Satellite, Inc. v. Echostar Satellite L.L.C.*, 430 F.3d 1269 (10th Cir. 2005). The Trustee and Debtor did not provide any evidence of changed circumstances before and after the Debtor entered into the Agreement. Regardless, for the other reasons stated above, the Court finds the Defendants have failed to establish they were

## CONCLUSION

The Court found Detter to be extremely credible and the Court has no doubt the derogatory posting and flyer were detrimental to Peak, and to Detter and Biba personally. However, that is a side issue to the legal issue before the Court, specifically whether the Defendants have a defense to the Trustee's claim under § 542(b). For the above reasons, the answer to that question is no. Accordingly,

IT IS ORDERED the Complaint for Turnover of Estate Property filed by the Trustee is GRANTED and judgment shall enter in favor of the Trustee and against Defendants Peak Rehabilitation of Denver, LLC, Michael Biba, and Michael T. Detter, jointly and severally, in the amount of $98,000.00, plus costs of $949.26, interest at 5.25% from March 10, 2010 (based on the Prime Rate as published by the Wall Street Journal, plus 2%) and attorneys' fees of $10,797.00.

Dated: June 22, 2011

BY THE COURT:

_____
Michael E. Romero
U.S. Bankruptcy Judge

---

relieved of their obligation to perform under the Note.